### DUFF v. GILLILAND et al.

(Circuit Court of Appeals, Third Circuit. June 23, 1905.)

No. 25.

1. PATENTS—CONTRACT OF ASSIGNMENT—GROUNDS FOR CANCELLATION.

A contract assigned the legal title to a patent for a gas producer to a trustee for the benefit of a company, in consideration of the payment by the assignee of one-third of all royalties received from licensees. The company subsequently engaged in the building of the producers itself, granting licenses to those to whom they were sold. The contract contained no provision respecting such building operations, which were not at that time contemplated, but the patentee was fully advised of the company's action, and from time to time expressed his approval thereof. *Held* that, while such operations were outside of the contract, he was estopped by his acquiescence from claiming that they were in violation of

it and entitled him to its cancellation, or from claiming a share of the profits of such business.

2. SAME—TRUST—EQUITY JURISDICTION.

Such contract required the company to keep accounts showing the licenses granted, which should be subject to the inspection of the patentee, and to account at stated periods for his share of the license fees received. *Held*, that the conveyance of the legal title to the patent on such conditions created a trust in both the trustee and the company in favor of the patentee in respect to one-third of the license fees collected, which a court of equity had jurisdiction to enforce, and that a bill alleging fraud in failing to account for fees, and in failing to charge the same to the company on sales made to customers which included licenses, and that the company refused to allow an inspection of its books, stated a cause of action for equitable relief.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 135 Fed. 581.

Robert T. Totten and James I. Kay, for appellant.

George B. Gordon, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the Circuit Court of the United States for the Western District of Pennsylvania. The case in the court below was made by a bill in equity, brought by Edward J. Duff against Alexander Gilliland, trustee, and against him and the other defendants Bradley, his partners doing business under the firm name of Duff Patents Company.

The complainant, who is a citizen and resident of England, was the inventor and patentee of a gas producer, patented in England and afterwards in the United States. In 1893 he had a brother, Alfred B. Duff, residing in Allegheny City, and he was related to James A. Bradley and William H. Bradley, who also resided there. The complainant had made an invention for a certain type of boiler grate, which was covered by letters patent of the United States issued in 1890. In order to introduce that patent into the United States, he made a contract, March 1, 1893, with the Bradleys, authorizing them to sell the whole of the patent, or grant licenses under the same. Nothing resulted from this agreement. The complainant, however, came to America during the summer of 1893, and while here disclosed to his brother and to the Bradleys, the fact that he had made an invention with reference to gas producers. There was an informal understanding that the complainant's brother, Alfred B. Duff, and the three Bradleys, James A., William H. and William C., should take charge of the American rights for the plaintiff's invention, which had not yet been patented in the United States. Accordingly, the plaintiff's brother and the three Bradleys, for that purpose, organized a partnership, called the Duff Patents Company, which was to handle the Duff Gas Producer in this country. The complainant, E. J. Duff, returned to England in the summer of 1893, and did not again come to America until 1899. The Duff Patents Company endeavored to introduce the Duff gas producer, the complainant having sent them from England, from time

to time, sketches and drawings of his ideas, and explanations as to how the producers should be built. The company tried to get some producers built in America, so as to demonstrate the utility of the invention. The American patent was issued on the 27th day of March, 1894. During that spring, the Duff Patents Company arranged with one Swindell, who was a builder of furnaces, to take a license on a royalty basis for the construction of the Duff gas producer. They also agreed to license some other people, and were desirous of making a written agreement with Duff. As the complainant had returned to England, matters between the patents company and him were necessarily arranged by correspondence.

In the spring of 1894, A. B. Duff went to England, and while there made an arrangement with his brother, on behalf of himself and the Bradleys, that an agreement should be executed between them, which would authorize the Duff Patents Company to manage the business of disposing of licenses for the gas producer, for the benefit of complainant as well as of themselves. A. B. Duff took over with him for execution a form of agreement, written out by one of the Bradleys, the original draft of which appears to have been copied from the boiler grate agreement. It was a license arrangement, and stated that "the second party are prepared to undertake the sale of rights of manufacture," and "shall have full and sole right and authority to effect such sales." It provided that the Duff Patents Company "shall retain two-thirds of the gross payments received by them for such sales or licenses, out of which moiety (sic) of proceeds they shall defray all costs incurred by them in working the business; the other moiety (sic) of the proceeds shall be remitted to the first party in full." Pending the execution of this agreement by E. J. Duff, who seems to have been reluctant to make any written agreement, the Duff Patents Company, on June 14, 1894, wrote to him, pressing him to send on an agreement. A. B. Duff wrote to his partners from England, on the 29th of June, 1894, and, after saying that his brother had forwarded him their letter of the 14th, says:

"In regard to the agreement, I hope to send it along in a few days. It has not reached me yet, but Ned says he will send it in a few days, but is very busy. I have been after it ever since I came here, but since you have written on the matter, I guess he will get it done, though he says he does not see why it is necessary."

This agreement was finally sent over by complainant. It was submitted by the Duff Patents Company to the above-mentioned Swindell, who desired to become a builder of these gas producers, but he doubted their authority under it to grant the licenses. Upon submission to Swindell's counsel these doubts were confirmed. The Duff Patents Company then had their attorneys prepare an assignment and agreement, of the form here in suit, making W. H. Bradley trustee. They sent it to complainant, explaining the reason in a letter dated July 22, 1894, of which the following is an abstract:

"When your agreement came to hand, we called upon Swindell & Bro. to make our contract, and they referred us to their patent attorney, who exam-

ined our license and said he would not advise his clients to enter into an agreement with us, from the fact that we simply had a power of an attorney and not a transfer of your patent to us, and we got advice from our patent attorney, and he drew up proper papers, which we enclose for your signature, and have it witnessed. Both attorneys said when any individual license was to be granted, would require all signatures. According to your agreement, hence, W. H. B., as trustee. You need not go before American consul. Simply witness and forward to us as soon as possible. Our prospects are exceedingly bright. W. H. B. went up to Bellevernon Glassworks and is certain of landing ten alterations and two new ones, and several others on the string. Don't fail to return these papers at once. Date paper when signed. *This agreement does not take away any of your rights, simply facilitates our business*. We intend to push along pending these papers."

The complainant did not assent to W. H. Bradley being named trustee in said agreement, but substituted his brother, A. B. Duff, as trustee, and then signed it as of August 6, 1894. This agreement contains (1) a formal and absolute assignment of complainant's entire right, title and interest in and to the letters patent No. 517,-271, for his gas producer, to his brother, Alfred B. Duff, party of the second part, "in trust and for the use of James Anderson Bradley, William Henry Bradley, Alfred Barker Duff and William Chapman Bradley, their legal representatives and assigns, all of Allegheny aforesaid, partners doing business under the firm name of the Duff Patents Company, to the full end of the term for which said letters patent are granted." Then follows a declaration of certain conditions and covenants, in consideration of which, and for the performance of which, the foregoing grant was made. These covenants, duties and reservations are all for the benefit of the party of the first part, complainant, and are set out with fullness and particularity in five paragraphs. They are briefly:

First. That party of the second part shall not sell or transfer the right, title and interest of said letters patent, or any part thereof, without the written consent of the party of the second part, excepting the power given to the said party of the second part to grant licenses for single states or territories, at his discretion;

Second. That the said party of the second part shall pay to the said party of the first part one-third of the gross amounts received by said party of the second part for and under each of said licenses;

Third. That the said party of the second part "shall keep proper books of accounts, in which shall be clearly recorded all their transactions under this agreement and in regard to the grant of licenses under said letters patent, which accounts shall be audited every six months, and a copy of certified balance sheets, together with full statements of all licenses and sales effected, shall immediately afterward be sent to said party of the first part";

Fourth. That said party of the first part shall have the right, either personally or by his attorney, to make examinations of all books, accounts and documents relating to the business transactions of the said party of the second part, his legal representatives and assigns, relating to the sale of rights and licenses under said letters patent;

Fifth. "That in case the amount paid by the said party of the second part, his legal representatives and assigns, to the said party

of the first part, under this agreement, shall not, at the end of two years from the date hereof, amount to the sum of at least 350 pounds sterling, or should the said party of the second part, his legal representatives or assigns, fail to comply with the conditions and agreements herein contained, or any of them, then the said party of the first part, his legal representatives and assigns shall have the right to recover all the right, title and interest in said letters patent, and the same shall revert to him, his legal representatives and assigns, upon notice in writing to that effect being served upon said party of the second part, his legal representatives and assigns."

Under this agreement, and according to its terms, the Duff Patents Company conducted the business, for more than a year, devoting itself to the sale of licenses to manufacturers and users, and to widening and increasing the use of the patented invention. They then commenced themselves manufacturing the gas producers, for the reason, as they allege, that their customers preferred to buy producers already manufactured, with the license cost included in the price of the producer. The business was so conducted until 1899, when A. B. Duff, owing to ill health, retired from the business, and assigned his interest to the defendant, Gilliland, who, with complainant's consent, became trustee under the agreement.

During the period up to 1899, and afterwards, there was voluminous correspondence between the complainant in England and the Duff Patents Company. In this correspondence, are letters in which complainant objects to the patents company engaging in the manufacturing business, charging that by so doing they decreased the sale of licenses, and restricted the general use of the patented invention. The improvement in the general business of the country, however, had conduced to the prosperity of the patents company, as is evidenced by letters from the complainant, congratulating the company on the returns made to him and the increasing success of their undertaking. After 1900, however, dissatisfaction was evinced by complainant, and disagreement between the parties finally culminated in complainant coming to this country in 1903. Claim was made by him that he was entitled, as his proportionate share, to one-third of the profits of the manufacturing business carried on by the company; that the agreement between them did not contemplate or authorize the patents company entering into the manufacturing of the gas producers, and that engaging in such business made it to the interest of the patents company, his trustee, to curtail the sale of licenses and to confine the use of the patent to the business transacted by said company; that such a course tended to increase the profits of the company at the expense of the complainant, and that as these profits were made outside of the scope of the agreement, and in violation of the true meaning and purpose thereof, these profits, or a due proportion of them, should be accounted for to the complainant. A bill was filed upon this theory, in which it was alleged, in addition, that the defendants had refused to allow the complainant an inspection of their books and accounts, showing all their transactions in relation to the licenses of his patent, and prayed (1) that an account might be taken, and

the defendants decreed to pay to complainant one-third of all the profits and benefits of the entire revenue made by defendants in the granting of licenses and the manufacture and sale of the patented gas producers; (2) that Gilliland, one of the defendants, as trustee of the legal title, be ordered to reassign unto complainant the entire right, title and interest in and to said letters patent, and that said agreement may be canceled and declared null and void.

In the testimony, there was evidence tending to show that license fees had been collected and not accounted for in full to complainant, and that the licenses for gas producers manufactured and sold by the patents company were charged to it at a less rate than those charged to outside parties, and that this practice, which resulted in the loss to complainant of a large sum, to wit, of $8,000 or thereabouts, had been concealed from the complainant, or at least that no knowledge of the same had come to him until the taking of the testimony. Leave to file an amendment to the bill, setting forth these alleged fraudulent practices, was thereupon asked for and allowed, and the trial proceeded upon the original bill so amended, and the answers thereto.

Although the contention of complainant, that the business of manufacturing gas producers, as engaged in by the patents company, was outside the scope of its agreement with the plaintiff, and unauthorized thereby, and that there was, on that account, an equity in the plaintiff to have an accounting of the profits arising from such business, and a decree for the payment of a due and proportionate share thereof, is not without merit, we incline to agree with the court below that the correspondence between complainant and the patents company shows a sufficient acquiescence on the part of the complainant, in this mode of conducting business under the agreement, to estop him from now objecting thereto.

The bill, as amended, distinctly, and with the requisite specification, charges fraud. Sufficient evidence has been adduced, as to suppression of facts in regard to the amount of license fees collected and not accounted for, and undercharges in license fees due for producers made by the defendants, accompanied by a refusal to make full disclosure of the books and accounts of the said company, to clothe the complainant with a right to pursue defendants for redress in some form of action. Indeed defendants do not deny that this constitutes sufficient ground for a suit for damages at law. They deny, however, that any ground for equitable relief is furnished thereby. In this, we cannot agree.

Apart from the question of fraud, as a ground of equitable jurisdiction, the difficulty is in the view taken by the defendant and sustained by the court below, that the relation existing between the complainant and the Duff Patents Company was simply and solely the legal relation arising from the transfer, absolute in its terms, of complainant's patented right to A. B. Duff, ignoring the trust which we think attached to the legal title. Of course there was an absolute conveyance and transfer of all the right, title and interest of the complainant, in and to the patent in question. Nothing less than this would have served the purpose of a trust, however ex-

pressly created. That the whole legal title to a particular property should be in one person, with a special confidence reposed in him to apply the property faithfully and according to such confidence, for the benefit of another, amounts to the definition of a trust. The agreement of August 6, 1894, in terms constituted A. B. Duff trustee for the members of the Duff Patents Company, including himself. It is argued by defendants' counsel, that this is the only trust created by that instrument. It will be observed, however, that it is a passive and naked trust, and the clear purpose and intent gathered from the instrument itself, is that the Duff Patents Company, as well as A. B. Duff, the nominal trustee, were to administer the business in connection with the patent assigned, and consequently were affected by the trust and confidence expressed in the later paragraphs of the writing, to which we have already referred. The express trust thus created would, under the strictest construction, constitute the defendant company, as well as Gilliland, the successor of A. B. Duff, trustees at least for the one-third of the license fees collected by them, or which they were in duty bound to collect. But the scope of a trust as to property whose title has been absolutely conveyed, may be defined by writings and correspondence between the parties with reference to the subject-matter of the trust. Writings of this character are found in the correspondence set out in the record; and we especially note the letter of July 22, 1894, written by the Duff Patents Company to the complainant, with reference to this very agreement. It seems to us to throw a flood of light upon the real purpose of the conveyance of the title to the patent, and show that it was not intended to enlarge the rights of the defendants, or diminish those of the complainant as they existed under the agreement first drawn and submitted to the counsel of Swindell & Bro., as referred to in said letter.

The administration of such a trust is, of course, a primary head of equity jurisdiction, and an accounting an ordinary mode of equitable procedure. We agree with the court below in thinking, that the cancellation of the agreement and the reconveyance of the patent, as prayed for, should not in this case be granted, but we do think there should be an accounting for the licenses that have been granted by the defendants, and the fees collected therefor, including those collected from infringers, with or without suit, and those charged by the defendants against themselves for gas producers manufactured under the patent by the defendants. Equity and good conscience clearly require that these defendants, as trustees of these license fees, should be charged with the highest rate ever collected from outsiders for similar articles.

The decree of the Circuit Court is reversed, and the case will be remanded for further proceedings in accordance with the views expressed in our opinion.